[Crim. No. 1399.  Second Appellate District, Division Two.—January 27, 1927.]

THE PEOPLE, Respondent, v. EARL NORTH, Appellant.

[1] CRIMINAL LAW — ROBBERY — IDENTIFICATION — ALIBI — EVIDENCE— VERDICT.—In this prosecution for robbery, where the question of identification and, consequently, that of alibi relied on as a defense, was one of fact to be deduced from conflicting evidence, and the testimony was direct, positive, and amply sufficient to warrant the jury in finding a verdict of guilty, a reversal of the judgment is not authorized.

[2] ID.—DEGREES OF ROBBERY—VERDICT—APPEAL.—Section 211 of the Penal Code, defining robbery, is sufficient to support a conviction of robbery in either the first or second degree and where a defendant is charged with the crime of robbery, a verdict of rob-

---

1. See 8 Cal. Jur. 276.

bery in the second degree will not be reversed because under section 211a of the Penal Code the conviction should have been for robbery in the first degree.

[3] Id.—Conviction of Lesser Offense—Verdict—Judgments.—A verdict of guilty of an offense less than that charged in the information, but necessarily included in it, is proper, and the verdict and judgment will not be disturbed merely upon the ground that the defendant received punishment less severe than the evidence may have warranted.

[4] Id. — Nature of Crime — Instructions. — In this prosecution for robbery of a drug-store, the trial court did not err in refusing to instruct the jury to acquit defendant of the crime of robbery and find him guilty, if at all, of grand larceny or petit larceny.

[5] Id.—Instructions—Sufficiency of.—In such prosecution, it was not error for the trial court to refuse a requested instruction covered by given instructions, although the given instructions were not couched in the language embraced in the one refused.

[6] Id. — Misconduct of Trial Judge — Error — Absence of Miscarriage of Justice.—In such prosecution, although reprimands by the trial judge, and his language and attitude toward defendant's counsel, constituted error, it cannot be said that the error was sufficiently prejudicial to defendant to warrant a reversal under section 4½ of article VI of the constitution, where, in the absence of other substantial error and in view of the whole record, there has been no miscarriage of justice.

[7] Id.—Attorney at Law—Conduct of Cause—Disregard of Rulings of Court.—Attorneys representing defendants in criminal cases are frequently inspired with the justness of their causes to a degree which prompts undue enthusiasm and persistence, but their interest in a client should at no time be recognized as a justification for ignoring or disregarding the rulings of the court.

[8] Id. — Section 4½, Article VI, Constitution — Appeal. — Section 4½ of article VI of the constitution, which requires an affirmance unless from the whole record it appears that there has been such a miscarriage of justice as to work the conviction of an innocent person, is mandatory upon appellate tribunals.

---

(1) 17 C. J., p. 264, n. 89, p. 270, n. 19.    (2) 34 Cyc., p. 1812, n. 96.    (3) 17 C. J., p. 362, n. 94.    (4) 34 Cyc., p. 1811, n. 94.    (5) 16 C. J., p. 1063, n. 85.    (6) 16 C. J., p. 830, n. 38; 17 C. J., p. 368, n. 5.    (7) 16 C. J., p. 887, n. 97.    (8) 17 C. J., p. 368, n. 5.

3.  See 14 Cal. Jur. 105.
5.  See 8 Cal. Jur. 314.
8.  See 8 Cal. Jur. 601.

APPEAL from a judgment of the Superior Court of Los
Angeles County and from an order denying a new trial.
Charles S. Burnell, Judge. Affirmed.

The facts are stated in the opinion of the court.

John F. Groene for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy
Attorney-General, and James S. Howie for Respondent.

CRAIG, J.—The appellant was convicted of robbery
alleged by information of the district attorney of Los
Angeles County to have been committed on or about the
twenty-second day of February, 1926. A motion for new
trial was presented, which was denied, and he appeals from
the judgment and from the ruling upon said motion.

A witness for the People, named Arthur Niemi, testified
that he and the defendant were on the date last mentioned
employed by the Liggett Drug Company at Hollywood; that
on the night of Washington's Birthday the witness and one
Oliver Peterson were closing the front door of the store,
as the defendant entered from the rear, wearing a suit of
coveralls, and a black cloth over his head in which cloth
two holes had been cut for vision; that North pointed a
revolver at Niemi and said, "Give me the money," to which
the latter replied, "There it is, help yourself"; that the
defendant then indicated a closet and said, "Get in there,"
which Niemi and his companion did. The latter further
testified that he heard North open the safe and remove cash-
boxes, heard money jingle; that as soon as he ceased to
hear any sound the witness came out, directed Peterson to
call the police, and ran to the rear door, but failing to see
North, he returned, replaced the cash-boxes in the safe and
locked it.

Peterson was unable to identify the defendant, but cor-
roborated Niemi's testimony as to occurrences, and re-
membered the greasy condition of the coveralls as described
by other witnesses. The manager of the building testified
that a strange automobile, which he described as a brougham
with a sloping rear top, stood at the back of the store on the
night in question, at about 10:40 o'clock. The night

manager of a Hollywood automobile service testified that
on the night of the 22d the defendant rented a Moon sedan
car with curved or rounded top; that he returned at about
11:20 P. M., leaving the machine, walked to the curb, and
ran across the street; this witness swore that the car had
not been driven more than twelve or fourteen miles by
North; that only one-half gallon of gasoline had been
used from the tank. The engineer of the building in which
the drug-store was located identified the coveralls as his
own property, and testified that he hung them on a rail
when he left at about 6 P. M., but on the following morn-
ing he found them on the floor of the cellar. Three officers
searched the defendant's home on Sunset Boulevard, and
testified that they there found a suitcase containing the
black mask described by Niemi; that when arrested North
stated that he had been for a walk, but later said that he
rented a car and drove about the city, between Los Angeles
and Beverly Hills. The manager of the drug-store testified
that $2,189.64 was taken from the safe on the night of
February 22, that $195 remained, and that vouchers and
money not taken were scattered on the floor.

The defendant testified, denying *in toto* the evidence
introduced by the People, and on the stand abandoned his
former statement to the officers, heretofore mentioned,
averring that he accidentally met a lady by the name of
Joy Warford at a drug-store located at Sixth and Hill
Streets, in the city of Los Angeles, whom he carried to her
home in the south part of the city. Miss Warford was
sworn and testified that she "taught ball-room" evenings
and cut film at moving picture studios during the daytime,
but that on February 22d she had not worked; that pre-
viously to meeting the defendant she had been to a small
picture show on Hill Street near Sixth Street; that North
drove her home and that he left her at about 11:05 P. M.
This latter witness further testified that she had known
the defendant about eight months; that she did not remem-
ber at what time she went to town, the picture that she
saw, or what it was about; she testified, however, that upon
entering her residence to obtain a match for the defendant
she observed that there was a difference of exactly two
minutes between her watch and the clock; she was positive
that she observed both, and testified, "My watch was 11:07

and the clock was 11:03.'' The defendant averred that he ate dinner at home on the night in question; that he went out soon afterward and that his wife went to the residence of her aunt. This Mrs. North corroborated, but denied any knowledge as to the time of his return.

[1] The defense advanced in this case consists of an asserted alibi. It is denied that North was at the scene of the robbery, or had any knowledge of the crime. It is insisted that from the brief and abrupt commands given Niemi at the drug-store it would have been impossible for the latter to identify a person's voice. Niemi swore, however, that he had worked in the same establishment with North for more than a month; that he conversed with him and heard him talk daily during that time; that he was familiar with his voice, and that he immediately recognized the defendant's voice and general build, and knew that North committed the robbery. The question of identification, and consequently that of alibi, therefore, was one of fact, to be deduced from the conflicting evidence. The testimony was direct, positive, and amply sufficient to warrant the jury in finding a verdict of guilty, and upon such state of the record a reversal of the judgment is not authorized.

[2] The information charged the crime of robbery, but did not specify the degree. The jury returned a verdict of ''guilty of robbery, a felony, in the second degree, as charged in the information.'' It is contended on behalf of the appellant that under such an allegation he could only be convicted of robbery in the first degree, and section 211a of the Penal Code is cited as authority for this proposition. Said section reads as follows:

''All robbery which is perpetrated . . . by a person being armed with a dangerous or deadly weapon is robbery in the first degree. All other kinds of robbery are of the second degree.''

Section 211 provides that: ''Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence and against his will, accomplished by means of force or fear.''

In *People* v. *De Verre,* 68 Cal. App. 742 [230 Pac. 197], under facts almost identical with those here presented in so far as they would bear upon the distinction between robbery

in the first degree and robbery in the second degree, it was held that a verdict of guilty of robbery in the second degree would not be disturbed; and in *Ex parte Colford,* 68 Cal. App. 308 [229 Pac. 63], the petitioner for a writ of *habeas corpus* contended that under a similar allegation to that before us he should have been convicted, if at all, of robbery in the second degree. It was there held that, "The information follows the language of section 211 of the Penal Code, which defines robbery, and is sufficient to support a conviction of either degree of the crime, as defined by section 211a." [3] Also, *People* v. *Church,* 116 Cal. 300 [48 Pac. 125], cited by appellant, clearly upholds the proposition that a verdict of guilty of an offense less than that charged in the information, but necessarily included in it, is proper. In view of the decisions above cited, the verdict and judgment will not be disturbed merely upon the ground that the defendant received punishment less severe than the evidence may have warranted.

[4] Appellant complains of the refusal of the trial court to give a requested instruction defining robbery, grand larceny, and petit larceny, and charging that if the jury should find that the personal property taken was over $200 they *must* find the defendant guilty of grand larceny, and if less than that amount they *must* find him guilty of petit larceny, for the reason that larceny is an element of robbery. It is too obvious for argument that the defendant was not entitled to an instruction in effect directing the jury that they must acquit on the charge of robbery and find him guilty if at all only of grand larceny or petit larceny.

[5] It is further insisted that the identification of the defendant was so doubtful, and the evidence upon that question so weak, that the trial court erred in refusing to give a requested instruction which is quoted in the briefs. The jury were fully instructed upon the questions of identity, alibi, reasonable doubt, and the credibility of witnesses. The instructions given were not couched in the language embraced in the one which was refused, but we think the issues were covered, and that the action of the court in this respect was not error.

[6] Reprimands by the trial judge, and his language and attitude toward the defendant's counsel during the trial,

are assigned as misconduct prejudicial to the rights of the accused. During the cross-examination of the People's witness Niemi the following colloquy occurred:

"Q. (By Mr. Groene.) Do you know the direction that the alleged holdup went when he left there?

"The Court: Just a moment. This witness hasn't talked anything about any alleged holdup. Who do you mean, the defendant?

"Mr. Groene: No, the holdupman. I don't know about the defendant. We hold the defendant was not there, your honor.

"The Court: That is the only person he testified it was.

"Mr. Groene: We know it was not the defendant, and I am asking him the question—

"The Court: Just a moment, Mr. Groene. The witness need not answer the question. It is not cross-examination. He has not testified about any person under the name of the alleged holdup man. He has testified to the defendant and no one else. Consequently this is not proper cross-examination.

"Mr. Groene: Well, may it please the court, we hold that this defendant was not there. We know he was not there.

"The Court: Will you take your seat, please?

"Mr. Groene: And we know—

"The Court: Will you take your seat, Mr. Groene?

"Mr. Groene: Yes, but I—

"The Court: Now, just a moment. I don't want to have to punish you for contempt of court.

"Mr. Groene: No, I don't wish to be.

"The Court: But you are going to jail as sure as you are a foot high if you don't—

"Mr. Groene: But I wish to bring out the evidence.

"The Court: Now, will you please keep quiet? I don't like to have to take extreme measures, Mr. Groene, but I will have to do it if you don't abide by the rulings with the proper attitude and decorum. You will find this is one department where you have got to do that. You will proceed in an orderly way here."

Later, during the same examination, the record contains the following:

"Q. By Mr. Groene: Now, isn't it a fact that there was another person of the same size, same build?

"Mr. Fricke: Asked and answered. Objected to.

"The Court: Sustained.

"Mr. Groene: No, he has not answered that, your honor.

"The Court: Did you hear the ruling of the court?

"Mr. Groene: I am asking now—

"The Court: Did you hear the ruling of the court?

"Mr. Groene: Yes.

"The Court: I am going to have to deal with you very seriously in a very, very few moments if you don't stop this. The court has ruled, and you know when the court has ruled there is nothing further to be said. Two or three times after I have ruled you have proceeded to make some sort of statement. I don't want that thing to occur again during the trial.

"Mr. Groene: I am asking the question, your honor—

"The Court: Will you please ask another question?

"Mr. Groene: And he has not answered the question yet, and I would like to get an answer. I have asked him this question—

"The Court: Mr. Groene, the court now finds you guilty of contempt of court for your conduct and attitude in the case and for proceeding to argue matters after the court has already ruled. Have you any reason to offer why the court should not now punish you for contempt?

"Mr. Groene: I think you should not, your honor, for I am within my rights as an attorney defending my client, to the best of my ability, but I would like at this particular time to let the stenographer refer back to his notes and see if he has answered the question I asked.

"The Court: Do you consider it the proper and courteous thing to do to persist in attempting to argue after the court has ruled? If that is your idea, you have something to learn. I won't impose any punishment at this time, because I take it your attitude is very largely due to ignorance of the proper procedure, but I insist it do not appear again, for if it does I shall not be lenient another time."

Immediately preceding these last questions, answers and rulings, the record discloses the following:

"Q. (By Mr. Groene:) Isn't it a fact that there was another employee in that same department, the same size, same build?

"A. But not the same voice.

"Q. I am not asking you about voices. I know you don't know about the voice, but I am asking about the general appearance.

"Mr. Fricke: Just a moment. We take exception to counsel's remark.

"The Court: Yes, that remark is as improper as it possibly could be. If counsel knew anything in the trial of a case about proper courtesy in court he would have known better than to make it."

That the record reveals a clear departure from that courteous decorum emphasized by the trial court, we think cannot be doubted. Besides, a careful examination of the record discloses that the question quoted above, "Isn't it a fact that there was another employee in that same department, the same size, same build?" to which the objection was sustained on the ground that it had been asked and answered, had not in fact been directly answered, and counsel was entirely within his rights in insisting that a direct answer be given by the witness. [7] Attorneys representing defendants in criminal cases are frequently inspired with the justness of their causes to a degree which prompts undue enthusiasm and persistence. Their interest in a client should at no time be recognized as a justification for ignoring or disregarding the rulings of the court, but experienced jurists, also realizing the propensities of over-zealous attorneys in such cases, are often confronted with situations requiring patience, tact, and firm but courteous demeanor, lest those whose life or liberty is in the balance shall suffer through unpleasant controversies over which they have no control. We think the remarks of the court in this instance constituted error, but we are not authorized or impelled to reverse the judgment upon that ground alone, nor do the authorities cited by appellant require or justify such action. In *People* v. *Grider*, 13 Cal. App. 703 [110 Pac. 586], it was held that it is incumbent upon the complaining party to show how his substantial rights have been materially affected by irregularities or misconduct. And in *People* v. *Costa*, 24 Cal. App. 739 [142 Pac. 508], it was said that "Such fact, if true, standing alone in the absence of prejudicial error, would not justify a reversal of the case, but merely accentuates the effect of other errors disclosed by the record." The error here complained of is said to

have been humiliating to defendant's counsel and prejudicial to the defendant in the eyes of the jury. We concur in both assertions, but upon the whole record we do not think, in the absence of other substantial error, that in view of section 4½, article VI, of the constitution, we would be justified in reversing the judgment.

[8] Finally, it is asserted that an examination of the entire record requires a reversal under the provisions of the constitution last mentioned. Said section is mandatory upon appellate tribunals, and by denying a reversal under the circumstances therein specified, it requires an affirmance unless from the whole record it appears that there has been such a miscarriage of justice as to work the conviction of an innocent person. (*People* v. *Wong Hing*, 28 Cal. App. 230 [151 Pac. 1159]; *People* v. *Kizer*, 22 Cal. App. 10 [133 Pac. 516, 521, 134 Pac. 346].) We think the verdict and judgment in this case are abundantly supported by the record and that no different result would ensue from another trial.

The judgment and order denying the motion for new trial are affirmed.

Works, P. J., and Thompson, J., concurred.